1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN JONG-LA VUE, | Case No. 1:20-cv-01302-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 16, 18, 23) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

## I.

## INTRODUCTION

Jonathan Jong-La Vue ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]  Plaintiff submits that the ALJ erred by failing to afford great weight to treating psychiatrists without specific and legitimate reasons, by failing to provide clear and convincing reasons for rejecting Plaintiff's testimony, and in failing to properly analyze whether Plaintiff's mental impairments met or equaled a listing.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 7, 10, 11.)

**II.**

**BACKGROUND**

**A.    Procedural History**

On May 6, 2016, Plaintiff filed a Title XVI application for supplemental security income. (AR 15, 191-195.)  Plaintiff's application was initially denied on December 14, 2016, and denied upon reconsideration on December 14, 2017.  (AR 107-111, 117-122.)  Plaintiff requested and received a hearing before Administrative Law Judge Timothy S. Snelling ("the ALJ").  Plaintiff appeared for a hearing on September 11, 2019.  (AR 40-74.)  On July 31, 2016, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 12-36.)  The Appeals Council denied Plaintiff's request for review on August 5, 2020.  (AR 1-6.)

On September 11, 2020, Plaintiff filed this action for judicial review.  (ECF No. 1.)  On March 17, 2021, Defendant filed the administrative record ("AR") in this action.  (ECF No. 12-1.)  On June 16, 2021, Plaintiff filed an opening brief.  (Pl.'s Opening Br. ("Br."), ECF No. 16.)  On July 19, 2021, following two stipulated extensions of time, Defendant filed an opposition brief.  (Def.'s Opp'n ("Opp'n"), ECF No. 18.)  On August 3, 2021, Plaintiff filed a reply brief.  (Pl.'s Reply ("Reply"), ECF No. 23.)

**B.    The ALJ's Findings of Fact and Conclusions of Law**

The ALJ made the following findings of fact and conclusions of law as of the date of the decision, September 12, 2019:

- Plaintiff has not engaged in substantial gainful activity since May 6, 2016, the application date.

- Plaintiff has the following severe combination of impairments: autism, hyper-mania, anxiety attacks, depression, mood disorder not otherwise specified, anxiety disorder not otherwise specified, social phobia, and borderline intellectual functioning.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

- Plaintiff  has the residual functional capacity to lift and/or carry 50 pounds occasionally

2

and 25 pounds frequently; he can sit, stand, and/or walk without limitation in an 8-hour workday with normal breaks.  This capacity most closely approximates a wide range of medium work as defined in 20 CFR 416.967(c): the claimant could frequently climb ladders, ropes, or scaffolds.  He has no limitations with climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling.  He must avoid concentrated exposure to and dangerous and unprotected workplace hazards.  The Plaintiff can understand, remember, and/or apply information necessary to perform routine and repetitive work tasks.  The Plaintiff can have no more than occasional face-to-face interaction with the general public, coworkers, and supervisors (1/3 of the workday with each group).  The Plaintiff can maintain concentration and attention, persistence and pace, for routine repetitive work tasks.  The Plaintiff can adapt to routine repetitive work tasks and/or manage himself in an employment setting for routine repetitive work.

- Plaintiff has no past relevant work.
- Plaintiff was born on April 25, 1997 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed.
- Plaintiff has at least a high school education and is able to communicate in English.
- Transferability of job skills is not an issue because the Plaintiff does not have past relevant work.
- Considering the Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the Plaintiff can perform.
- Plaintiff has not been under a disability, as defined in the Social Security Act, since May 6, 2016, the date the application was filed.

(AR 15-32.)

### III.

### LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

---

[2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

1  (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

2  considering the record as a whole, a reasonable person might accept as adequate to support a

3  conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

4  Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

5       "[A] reviewing court must consider the entire record as a whole and may not affirm

6  simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

7  Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

8  this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

9  for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

10  susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

11  upheld.").

12                                         **IV.**

13                          **DISCUSSION AND ANALYSIS**

14       Plaintiff raises three primary challenges in this appeal: (1) that the ALJ erred by failing to

15  defer to and afford greatest weight to the two well-supported, long-treating psychiatrists MSS

16  from Dr. Kamboj and Dr. Haack absent the requisite specific and legitimate reasons; (2) that the

17  ALJ erred by failing to provide a clear and convincing reason to disregard Plaintiff's symptom

18  testimony; and (3) that the ALJ's finding that the severity of Plaintiff's mental impairments did

19  not meet or equal the requirements of any listing is not supported by substantial evidence.

20       **A.   Whether the ALJ Provided Specific and Legitimate Reasons to Assign**
            **Reduced Weight to the Opinions of Dr. Kamboj and Dr. Haack**
21

22       Plaintiff submits that the ALJ committed harmful error by failing to the opinions of Dr.

23  Kamboj and Dr. Haack absent specific and legitimate reasons.

24       1.   General Legal Standards

25       The weight to be given to medical opinions depends upon whether the opinion is

26  proffered by a treating, examining, or non-examining professional.  See Lester v. Chater, 81 F.3d

27  821, 830-831 (9th Cir. 1995).  "Generally, the opinions of examining physicians are afforded

28  more weight than those of non-examining physicians, and the opinions of examining non-

treating physicians are afforded less weight than those of treating physicians.  Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2))[3]; see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) ("While the opinion of a treating physician is thus entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician.").

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  Garrison, 759 F.3d at 1012 (citing 20 C.F.R. § 404.1527(d)(3)).  The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  "The weight afforded a non-examining physician's testimony depends 'on the degree to which [he] provide[s] supporting explanations for [his] opinions.' "  Garrison, 759 F.3d at 1012 (citations omitted).

The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  It is the ALJ's responsibility to consider inconsistencies in a physician opinion and resolve any ambiguity.  Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999).  The ALJ can meet her "burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation thereof, and making findings."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989) (quoting Cotton v. Bowen, 779 F.2d 1403, 1408 (9th Cir. 1989)).

///

///

///

---

[3]  The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. § 404.1501 et seq., however Plaintiff is seeking supplemental security income, 20 C.F.R. § 416.901 et seq.  The regulations are generally the same for both types of benefits.

2.      The Court finds the ALJ Provided Specific and Legitimate Reasons for Assigning Reduced Weight to the Opinions of Dr. Kamboj and Dr. Haack

a.      **Arguments Concerning Legal Standard and Whether Treating Physicians**

Plaintiff focuses somewhat heavily on the appropriate standard applicable to weighing treating physician opinions, and takes issue with the manner of Defendant's briefing, in that Defendant's briefing questions whether these doctors were in fact treating physicians, and additionally generally discusses the substantial evidence standard rather than specific and legitimate standard.[4]  (See Reply at 3 ("the Defense argues *post-hoc* that 'it is unclear whether Dr. Haack or Dr. Kamboj ever treated Plaintiff, let alone during the relevant period.'  Def. Op. 12.  However, the ALJ did not make this argument in the rejection of the treating MRFC. The Defense cannot formulate the requisite specific and legitimate reasons on behalf of the ALJ"); Reply at 2 ("The Defense argues that 'substantial evidence' supports the ALJ's reliance of the MRFC opinions of the examining CE, Dr. Izzi and the non-examining state agency physicians, and supports the ALJ's 'giving less weight' to the opinions of the long-term treating physicians, Drs. Haack and Kamboj. Defense Opposition 8-14 (Def. Op.).  However, as the Treating Physician Rule is in effect in this case, the ALJ is required to afford deference to the well-supported MSS opinion of a long-term treating physician over the opinion of an examining or non-examining physician, absent only 'specific and legitimate' reasons supported by substantial evidence.").)

The Court finds it unnecessary to adjudication of this matter to rely on the contention by Defendant that it is unclear whether these physicians ever treated Plaintiff or if they were simply examining physicians,[5] as the Court finds the ALJ provided specific and legitimate reasons

---

[4]  Defendant does cite to cases referencing the specific and legitimate standard.  (Opp'n 13-14.)

[5]  Specifically, Defendant proffers: "[a]t the outset, it is unclear whether Dr. Haack or Dr. Kamboj ever treated Plaintiff, let alone during the relevant period . . . Dr. Kamboj stated that he saw Plaintiff monthly and Dr. Haack stated that she saw Plaintiff twice a month or monthly . . . Plaintiff went to Tulare four times during the three-and-a-half-year relevant period, and it is unclear who provided treatment at those appointments . . . does not appear that Plaintiff saw Dr. Haack or Dr. Kamboj monthly or bi-monthly . . . [p]resumably, Dr. Haack was the Tulare physician who saw Plaintiff on August 14, 2019, the same day she filled out her questionnaires [and] [a]t that encounter, Dr. Haack wrote, 'needs paperwork filled out mom did not give much information' . . . only examination

7

1   supported by substantial evidence in the record to afford discounted weigh to the opinions of Dr.

2   Haack and Dr. Kamboj, whether they are considered treating physicians or not.   Despite

3   Plaintiff's focus on the Defendant's statement, it does not appear Defendant is attempting to

4   inject the questioning of these physicians as treating sources, as a reason or basis for the ALJ's

5   weighing of the opinions, into the ALJ's analysis.   However, the Court does find that

6   Defendant's contention that these sources may not be treating sources has merit, and aside from

7   Plaintiff's assertion that this is a *post-hoc* argument, Plaintiff does not appear to substantively

8   address this contention.

9        The Court notes that within the November 30, 2018 form filled out by Dr. Kamboj, in the

10   space for frequency and length of contact, the space is left completely blank.  (AR 380.)  On

11   August 19, 2019, Dr. Haack, in the space asking for length and frequency of treatment, only

12   wrote "once a month," but did not specify the length of treatment.  (AR 392.)  On another form

13   signed by Dr. Haack apparently "for" Dr. Kamboj on August 14, 2019, Dr. Haack writes once

14   every 2 months, and again provides no length of treatment.  (AR 387.)

15        **b.     The ALJ Provided Specific and Legitimate Reasons**

16        The Court now turns to consideration of the ALJ's review and analysis of the medical

17   evidence and opinions that the ALJ completed before assigning various weight to the medical

18   opinions.  The ALJ summarized in extensive detail the following: (1) records of Tulare Pediatric

19   Group from September of 2015, with a diagnosis of depression and anxiety, a prescription for

20   Zoloft, a referral to counseling, notation of questionable autism, and referral to Dr. McDonald for

21   evaluation (AR 22); (2) a September 30, 2015 letter from Dr. McDonald who offered Plaintiff an

22   opinion in defense of the claimant's citation for indecent exposure; (3) a follow-up letter dated

23   October 20, 2015, from Dr. McDonald; (4) a December 9, 2015 psychological evaluation by Dr.

24   Thomas Middleton (AR 23); (5) psychiatric evaluation notes from Dr. Reddy; (6) a February 23,

25   2016 reporting of symptoms to Dr. Reddy, and offer of prescription for Abilify but rejection

26

27   finding is 'quiet,' [and] [t]he lack of treatment nor clinical findings supports the ALJ's finding that Dr. Haack and
     Dr. Kamboj overly relied on subjective statements and did not base their opinions on proper objective evidence."
28   (Opp'n 17.)

1   from mother and Plaintiff (AR 23); (7) a Central Valley Regional Center ("CVRC") eligibility

2   report dated March 10, 2016, which notes review of Dr. McDonald's and Dr. Middleton's

3   evaluations, and interview with the mother, with CVRC determination that Plaintiff was not

4   eligible for services, based on no evidence of development disability, and finding he did not meet

5   the criteria for Autism Spectrum Disorder or Intellectual Disability (AR 23); (8) Dr. Reddy's

6   notes dated March 29, 2016, indicating Plaintiff did not meet the criteria for CVRC as there were

7   no clinical indicators of an autistic disorder, and noting Plaintiff and mother chose to defer

8   medications and seek therapy to improve social skills (AR 24); (9) a record from Dr. Reddy

9   dated August 23, 2016, that reported noncompliance with therapy visits, and was counseled

10  regarding compliance (AR 24)[6]; (10) Dr. Reddy's notes dated February 20, 2017, diagnosing

11  Plaintiff with unspecified mood disorder and advising Plaintiff to seek therapy, comply with

12  medications, and seek occupational training (AR 24); (11) Tulare Pediatric Group notes dated

13  November 30, 2018, documenting anxiety and depression, with referral to counseling, and noting

14  Plaintiff's reporting noncompliance with medications because Lexapro made him "feel weird"

15  (AR 24): (12) notes dated January 30, 2019, indicating Plaintiff does not want to take Zoloft due

16  to insomnia, and noting diagnostic impression remained anxiety and depression with

17  recommended treatment of Zoloft and Melatonin, with referral to counselling (AR 24); (13)

18  follow-up notes from Tulare Pediatric Group dated May 1, 2019, indicating Plaintiff did not want

19  to see a psychiatric counselor, was noncompliant with medications, and stated he would benefit

20  from psychiatric counseling but refuses (AR 24); and (14) August 15, 2019 notes from Central

21  Valley Endocrinology with complaint of fatigue, denial of taking any medications, and

22  unremarkable physical exam (AR 24).

23      Based largely on these above records, the ALJ found objective confirmation of

24  impairments that would reasonably impose significant limitations to work-related activities.  The

25  ALJ then turned to consider the opinion evidence to determine the extent to which the

26

27  _____

[6]  At this juncture of the ALJ's opinion, the ALJ noted that the August 23, 2016 record was in "regard to the current
and relevant evidence," in contrast to the earlier summarized records that pertained to a period before the application
28  date.  (AR 24.)

impairments limit the Plaintiff, and summarized the opinions completed following a November 8, 2016 consultative exam, and November 7, 2017 consultative exam, both completed by Dr. Roger Izzi:

> On November 8, 2016, the claimant underwent a psychological consultative examination by Roger Izzi, Ph.D., who noted the claimant stated he has anxiety, does not function well around a lot of people, and does not remember. He reported he goes for walks by himself and does his own laundry. He reported he has occasional problems with eating habits and sleeping. He denied crying spells or hallucinations. At the time, he stated he was not taking any medications. He had no problems caring for his basic hygiene. On the mental status examination, Dr. Izzi noted the claimant was alert, responsive, oriented, appropriately dressed and groomed, was on time for the evaluation, and posture and gait were unremarkable. He seemed tense and picked at his chin. He made poor eye contact and seemed anxious. He stated he was feeling "gloomy, bored, and nervous." He exhibited some problems with delayed recall, but had no problems with attention or concentration. He had no language deficits and performed simple calculations adequately. There were no apparent problems with cognitive functioning. Dr. Izzi also reviewed the reports by Dr. McDonald and Dr. Middleton prior to this examination (Exhibit 7F, pp. 3-7).

> Dr. Izzi diagnosed an unspecified anxiety disorder and concluded the claimant appears capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. He would, however, have moderate limitations getting along with peers or be supervised in a work-like setting. His mood disorder will fluctuate and any significant fluctuation of mood may limit his ability to perform a complex task on a consistent basis over an eight-hour periods. The claimant appears capable of responding to usual work session situations regarding attendance and safety issues. He appears capable of dealing with changes in a routine work setting. He appears capable of managing his own funds (Exhibit 7F, pp. 5-6).

> On November 7, 2017, the claimant underwent a psychological consultative evaluation by Dr. Roger Izzi, Ph.D., who noted the claimant reported anxiety, depression, feeling isolated, losing track of time, and problems with conversation or making contact. He stated he stays home during the day and does household chores. There were no problems reported with his eating habits and appetite. Sleeping difficulties were reported. Unprovoked crying spells were denied. Suicidal ideation was denied. A history of abusing alcohol was denied. A history of drug usage was denied. Auditory hallucinations were denied. Visual hallucinations were denied. He denied seeing a mental health professional and was not taking any medications because he felt they did not work (Exhibit 12F, pp. 1-2).

> On the mental status exam, Dr. Izzi noted the claimant was fully

oriented and was appropriately dressed and groomed. He arrived on time. Posture and gait were unremarkable. The claimant reported feeling depressed and he tended to avoid eye contact. Dr. Izzi noted he seemed tensed and fidgety and constant repetitive tapping of the right foot was observed. The claimant stated he has always been shy and nervous and he does not want to talk to people. He exhibited no deficits with immediate or delayed recall, attention, or concentration. There were no obvious speech problems detected. There were no repetitions of words or phrases observed. He demonstrated minor deficits with calculations. Dr. Izzi noted there were no gross indications of psychosis or schizophrenia and no apparent loss of contact with reality. Hallucinations were not observed (Exhibit 12F, pp. 2-3).

Based on the encounter, Dr. Izzi diagnosed Autism Spectrum Disorder. Dr. Izzi concluded the claimant's performance on the mental status examination seemed satisfactory. The clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene. The present evaluation suggests that the claimant is capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period. His ability to get along with peers or be supervised in work-like setting would be moderately limited by his mood disorder. The claimant's mood disorder can be expected to fluctuate. Any significant fluctuation of mood may limit the claimant's ability to perform a complex task on a consistent basis over an eight-hour period. The claimant appears capable of responding to usual work session situations regarding attendance and safety issues. The claimant appears capable of dealing with changes in a routine work setting. He appears capable of managing his own funds (Exhibit 12F, pp. 3-4).

(AR 25-26.)  The ALJ concluded that both of Dr. Izzi's assessments were consistent in findings and opinions; noted Dr. Izzi had the benefit of reviewing the previous assessments by Drs. McDonald and Middleton; and accorded significant weight to Dr. Izzi's opinion as "consistent with the treatment history, clinical findings of record, and the objective diagnostic evidence." (AR 26.)

The ALJ then summarized and weighed the medical source statement opinion of Dr. Kamboj and Dr. Haack:

In a November 30, 2018 physical medical source statement, Dr. Prem Kamboj, M.D. stated the claimant has anxiety and depression. He is not very social, has social anxiety, and feels sad. Dr. Kamboj stated the claimant could sit at least 2 hours and stand/walk about 2 hours total in an 8- hour workday with normal breaks. He would need to be able to shift positions at will from sitting, standing, and walking. He could lift and carry 20 pounds occasionally and 10 pounds or less frequently. He could frequently twist, stoop, bend, crouch, squat, climb stairs, and climb ladders.

He would be off task 20 percent of the workday due to symptoms interfering with attention and concentration needed to perform simple work tasks. He is incapable of low stress work due to anxiety. He will have good days and bad days and would likely miss work about 4 days per month. He has social anxiety and cannot work well in a group setting. He stated these limitations would apply as early as "now" (Exhibit 13F).

Dr. Kamboj also completed a mental residual functional capacity questionnaire on November 30, 2018 stating the claimant has depression and anxiety and was taking Lexapro and Zoloft with side effects of "feeling weird, fatigue, and dizzy." He had no problems remembering locations and work like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; or asking simple questions or requesting assistance. He would be precluded from understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; or be aware of normal hazards and taking appropriate precautions for 5 percent of an 8- hour workday (24 minutes). He would be precluded from performing activities within a schedule, maintaining regular attendance and be punctual within customary tolerances; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and to adhering to basic standards of neatness and cleanliness; travelling in unfamiliar places or using public transportation; and setting realistic goals or make plans independently of others for 10 percent of an 8-hour workday (48 minutes). He would be precluded from working in coordination with or proximity to others without being distracted by them; and interacting appropriately with the general public for 15 percent or more of an 8-hour workday (72 minutes). In addition, Dr. Kamboj stated that social settings would exacerbate the claimant's symptoms.
He would miss work about 4 days per month. He would be unable to complete an 8-hour workday on 4 days per month. His intellectual functioning is average (Exhibit 14F).

On August 14, 2019, Susan S. Haack, M.D., completed a physical medical source statement on behalf of Dr. Kamboj and stated the claimant has anxiety, depression, and autism. He is aggressive, has social anxiety, and feels sad. His medications cause dizziness. Dr. Haack stated the claimant could sit at least 2 hours and stand/walk about 2 hours total in an 8-hour workday with normal breaks. He would need to be able to shift positions at will from sitting, standing, and walking and would need to walk around during an 8-hour workday. He could lift and carry 20 pounds occasionally and

10 pounds or less frequently. He could frequently twist, stoop, bend, crouch, squat, climb stairs, and climb ladders. He would be off task 20 percent of the workday due to symptoms interfering with attention and concentration needed to perform simple work tasks. He is incapable of low stress work due to anxiety. He will have good days and bad days and would likely miss work about 4 days per month. He has social anxiety and autism and does work well in a group setting. She stated these limitations would apply as early as "today" (Exhibit 15F).

Dr. Haack also completed a mental residual functional capacity questionnaire that is deviated somewhat with Dr. Kamboj's medical source statement of November 30, 2018. Specifically, Dr. Haack stated the claimant has autism, depression, and anxiety and was taking Zoloft with side effects of dizziness. He had no problems remembering locations and work like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; maintaining socially appropriate behavior and to adhering to basic standards of neatness and cleanliness. He would be precluded from understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; or be aware of normal hazards and taking appropriate precautions for 5 percent of an 8-hour workday (24 minutes). He would be precluded from performing activities within a schedule, maintaining regular attendance and be punctual within customary tolerances; sustaining an ordinary routine without special supervision; asking simple questions or requesting assistance accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and travelling in unfamiliar places or using public transportation for 10 percent of an 8-hour workday (48 minutes). He would be precluded from working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; responding appropriately to changes in the work setting; and setting realistic goals or make plans independently of others for 15 percent or more of an 8-hour workday (72 minutes). In addition, Dr. Haack stated that social anxiety and being autistic would exacerbate the claimant's symptoms. He would miss work about 4 days per month. He would be unable to complete an 8-hour workday on 4 days per month. His intellectual functioning is average. He cannot manage benefit payments (Exhibit 17F).

(AR 26-28.)

The ALJ then afforded "little weight" to the opinions of Drs. Kamoj and Haack as follows:

I accord little weight to the medical source statements from Drs.

Kamboj and Haack as they are not well supported by the weight of the evidence and also overstate the severity of the claimant's impairments, rely heavily on subjective reports, and some of the conclusions are contrary to the other, more persuasive and reliable evaluation opinions.

I note further that Dr. Haack's and Dr. Kamboj's physical assessments asserting significant limitations with physical functioning due to mental impairments is unusual, but appears these limitations are attributed to the only physical issue of significance: dizziness as a side effect of medications. Although the claims of dizziness are suspect because the claimant has very often reported he does not take his medications as directed. Nonetheless, considering even occasional dizziness, this would warrant some physical limitations, but not to the extent suggested by this physician as there is no evidence the claimant has had any falls or needs an assistive device to maintain his balance if or when he becomes dizzy.

With regard to the mental limitations suggested in the medical source statements by Drs. Kamboj and Haack, the degree of severity is not supported by the evidence. Indeed, Dr. Middleton and the CVRC found the claimant did not meet the clinical criteria for an Autism Spectrum Disorder. In addition, based on the review of the examining clinicians, CVRC also concluded the claimant was not eligible for services as there was no evidence of a Developmental Disability or an Intellectual Disability. Furthermore, although Dr. Middleton and the treating physicians have referred the claimant for therapy or counseling, he has refused to go. Willful failure to follow prescribed treatment is not justifiable pursuant to 20 CFR 416.930.

Both Drs. Haack and Kamboj assert the claimant has such significant attention and concentration deficits that he would be off task for a significant period of a typical workday; however, no examining physician reported significant deficits with attention or concentration. Dr. McDonald noted only that the school records indicate the claimant struggled with attention, focus, and concentration. In addition, she also noted the claimant had a 3.0 GPA in school. Treating clinician Dr. Reddy consistently noted the claimant exhibited good attention and on both examinations, Dr. Izzi found no problems with attention or concentration. Finally, the claimant is reported to spends much of his time watching videos, reading, drawing, painting, and listening to music. It seems to me that the weight of the evidence does not support this degree of limitation with the claimant's ability to sustain attention and concentration.

Overall, I found Dr. Izzi's assessment more persuasive and consistent with the weight of the evidence. Furthermore, Dr. Izzi had the opportunity to review the other examination findings of record and the earlier mental functioning assessments prior to his evaluation encounter.

(AR 28.)

The ALJ also assigned "much weight" to Dr. Garcia's assessment, though found Dr. Izzi's more than mild assessments to be more applicable to Plaintiff; afforded "much weight" to Dr. Liss's assessment; and found a limitation to simple, repetitive tasks with limited public contact to be consistent with Dr. Garcia's assessment, activities of daily living, the opinions of Drs. McDonald, Middleton, and Reddy, as well as a report by CVRC:

> I accord much weight to Dr. Garcia's assessment as it is consistent with the weight of the evidence available at the time. However, I would disagree that any of the claimant's limitations are mild as Dr. Izzi suggests mood fluctuations which would exacerbate the severity of symptoms, and therefore, limitations. Notwithstanding the claimant's failure to comply with prescribed treatment, it is reasonable to expect his symptoms would become worse when trying to perform complex tasks around many people. His social anxiety has consistently been an exacerbating factor and would reasonably interfere with the claimant's ability to apply information, interact with others, persist and maintain pace, and manage himself in some work environments. I do agree with Dr. Garcia's assessment that the claimant would best be suited to simple, repetitive tasks with limited public contact as this seems to be consistent with his activities of daily living, reported complaints, and objective assessments by Drs. McDonald, Middleton, and Reddy, as well as the report by the Central Valley Regional Center.
>
> On reconsideration, the Disability Determination Service psychiatric consultant, Dr. Robert Liss, Ph.D. affirmed Dr. Garcia's conclusions that the claimant could perform simple, repetitive tasks with limited public contact as there were no additional records forthcoming. The claimant attended the consultative examination and received a diagnosis of Autism, but was found capable of simple, repetitive tasks with limited public contact. The claimant is able to do chores, make simple meals, and tend to his personal care. There was no new or material evidence to support worsening or any change to his condition. Dr. Liss assessed the "paragraph B" limitations as moderate with regard to understanding, remembering and applying information; moderate with regard to interacting with others; moderate with regard to concentrating, persisting, or maintaining pace; and mild limitations with regard to adapting or managing himself (Exhibit 3A).
>
> Similarly, I accord much weight to Dr. Liss's assessment as it is also consistent with Dr. Garcia's evaluation of the evidence. As previously noted, I was quite persuaded by Dr. Garcia's conclusions albeit with some additional concerns. Overall, I accord most weight to the Disability Determination Service consultants' opinions and those of Dr. Izzi.

(AR 29.)

Based on a review of the ALJ's opinion, the referenced records, and the parties'

1   arguments, the Court finds no remandable error in the weight afforded the opinions of Dr.

2   Kamboj and Dr. Haack.

3   The ALJ discounted the opinion for relying heavily on subjective reports; for not being

4   well supported by the weight of the evidence; for overstating the severity of the claimant's

5   impairments; and based on finding the conclusions to be contrary to other opinions the ALJ

6   found to be more persuasive and reliable evaluation opinions.  Based on the Court's review of

7   the opinions compared to those of consultative examiner Dr. Izzi and the other evidence that the

8   ALJ gave greater weight to, the Court finds these to be a specific and legitimate reasons based on

9   substantial evidence.  Where both Dr. Kamboj and Dr. Haack checked boxes ranging from level

10  I-IV in severity of impairments, under each grouping of checkboxes, where the form states

11  "Please explain your responses under category [1 through 4]," the form is left completely blank

12  under every category.  (AR 384-385, 391-393.)  Dr. Kamboj listed Plaintiff's symptoms as "not

13  very social"; "social anxiety"; and "feels sad."  (AR 380.)  When asked to identify the clinical

14  findings and objective signs, Dr. Kamboj only wrote "as above," apparently only refencing these

15  symptoms.  (Id.)  When asked to what degree Plaintiff can tolerate work stress, Dr. Kamboj

16  checked the box for "Incapable of even 'low stress' work," and as a reason for this conclusion,

17  wrote "already has anxiety."  (AR 382.)  For the earliest date the functional limitations would

18  apply, Dr. Kamboj only wrote "now."  (AR 383.)  Similarly, on the form signed by Dr. Haack

19  "for" Dr. Kamboj, Plaintiff was diagnosed with anxiety, depression, and autism, with a fair

20  prognosis.  (AR 387.)  When listing Plaintiff's symptoms, Dr. Haack wrote "social anxiety";

21  "feels sad"; and "aggressive."  (AR 387.)  When asked to identify the clinical findings and

22  objective signs, Dr. Haack wrote "as above," apparently referencing these three symptoms.  (Id.)

23  The form also found Plaintiff incapable of "even 'low stress" work" and the reason for this

24  incapability was identified as "has anxiety."  (AR 389.)

25  As Plaintiff acknowledged in briefing (Reply 2, citing Reddick v. Chater, 157 F.3d 715,

26  725 (9th Cir. 1998)), the ALJ can meet the burden of providing specific and legitimate reasons

27  supported by substantial evidence to discount a treating physician's opinion contradicted by

28  another doctor's opinion, "by setting out a detailed and thorough summary of the facts and

conflicting clinical evidence, stating [her] interpretation thereof, and making findings." Magallanes, 881 F.2d at 751 (quoting Cotton, 779 F.2d at 1408); Reddick, 157 F.3d at 725 ("The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.").  The ALJ has, in the Court's opinion, clearly done so in a proper, thorough, and reasonable manner here.  Thus, while Plaintiff disagrees with the conclusions the ALJ reached from review of the medical evidence in the record, the ALJ adequately considered the longitudinal record as a whole, weighed the conflicting doctors' opinions concerning Plaintiff's mental (and limited physical) limitations, and made a determination supported by substantial evidence in the record in assigning reduced weight to some of the opinions, and assigning greater weight to other opinions.  It is the ALJ's responsibility to resolve conflicts in medical testimony, resolve any ambiguity, with part of that responsibility being "[d]etermining whether inconsistencies are material . . . and whether certain factors are relevant to discount[ing] the opinions" of the doctors.  Morgan, 169 F.3d at 603.  In cases such as here, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

### B.   Whether the ALJ Provided Clear and Convincing Reasons to Reject Plaintiff's Testimony

Plaintiff submits that the ALJ erred by failing to provide a clear and convincing reason to disregard Plaintiff's symptom testimony.

#### 1.   The Clear and Convincing Standard for Weighing Credibility

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to

produce the pain or other symptoms alleged." Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief; functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278 F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting Smolen, 80 F.3d at 1284).

### 2.     The ALJ's Credibility Determination

The ALJ summarized in detail the Plaintiff's alleged impairment and symptom testimony at the hearing and provided in function reports:

> At his hearing, the claimant testified he graduated from high school. He lives with his mother. He has never tried to drive, but could take a bus or get a ride. He goes to the park by himself and

feeds the ducks. He thinks he received special education services in high school and sometimes stayed after school for extra help. He has applied for one job, but was not selected. He has not applied for other jobs. He reported having behavioral problems such as anger outbursts and being rude to his mother. He believes his mood swings are improving, but he has triggers that make him angry, such as loud knocking on his door. At home, he feeds the chickens and washes the dishes. He makes ramen noodles for himself. Sometimes, he goes shopping with his family.  He no longer plays video games because he sold his game unit. He takes strolls by himself. He watches videos on his tablet and uses applications . . .

. . .  In the Function Report of August 8, 2016, the claimant reported he has anxiety attacks, social phobia, and hyper-mania due to Autism which prevents him from holding a job. He stays in his room and sleeps. He comes out to eat and goes back to his room. He is not going to school now because he has severe anxiety attacks when he is around people. He stays up late and sleeps during the day. He has no problems with personal care. He does not need reminders to take care of personal needs and grooming. He can prepare meals such as ramen noodles and does so about twice per day. He has always prepared his own simple meals. He does not do chores because working causes anxiety attacks. He goes out once every two or three days, but is afraid to meet people. He walks for travel and does not drive. He is able to go out alone and shop in stores for food a few times per week. He is able to count change, handle a savings account and use bank drafts but has no bills, savings account, or checking account. He spends time reading and listening to music. He does not spend time with others. He does not need reminders to go places and does not need anyone to accompany him. He does not get along well with his parents. His impairments affect his ability to talk, complete tasks, concentrate, understand, follow instructions, and get along with others. He can pay attention for a few minutes, but does not follow instructions well. He gets along well with authority figures most times. He does not take medications (Exhibit 5E).

In the Function Report of September 2, 2017, the claimant reported he has a mental condition that prevents him from associated with other people and talking to them. He has a hard time following instructions and completing tasks on his own. He stays in his room most of the day to read and draw. He stays up late. He has no problems with his personal care. He needs reminders to dress appropriately for the season or occasion. He also needs reminders to eat healthy. He prepares his own simple meals daily. He washes dishes and mows the lawn and does so when asked. He goes out about twice per week unless he is not in the mood or has no reason to do so. He walks to get around. He does not drive because he has no license. He shops in stores for arts and crafts materials and electronic devices about once per month. He does not pay bills and has no bank accounts. He has never used bank drafts. He enjoys drawing, painting, and reading and does so almost every day. He does not spend time with others and refuses to go with his family when asked. He does not like to talk to people and wants to be alone. His impairments affect his ability to talk, remember,

> complete tasks, concentrate, understand, follow instructions, and get along with others. His impairment affects his ability to socialize, talk to people, initiate a conversation. He does not know how long he could pay attention, but does not follow instructions well. He does not handle stress well (Exhibit 8E).

(AR 20-21.)

Following the review of the testimony and function reports, the ALJ concluded "the Function Reports overstate the limitations that would reasonably be attributed to the claimant's mental impairments. The weight of the evidence and the reliable and persuasive medical evaluations do not support the degree of limitation reported by the claimant and his friend in these reports.  As such, I accord them very little weight . . . After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 21.)

The Court acknowledges these preliminary statements by the ALJ concerning the discounting of the function reports and testimony is somewhat generalized.  The Court also concedes that the ALJ does not then in the analysis that follows, expressly state that a certain individual aspect of Plaintiff's testimony summarized above is specifically "discounted." However, the Court does not find it to be necessary here, as the ALJ's summary of all of the testimony and medical opinions/evidence is extensively detailed and methodical, and clearly lays out why the ALJ concluded Plaintiff's testimony concerning his symptoms and impairments was not in line with the weight of the evidence of record and the medical opinions that the ALJ found to be reliable and persuasive.  For review purposes, while the Court would prefer the ALJ to more clearly connect and expressly state the reasons for discounting individual aspects of the testimony, <u>Facey v. Comm'r of Soc. Sec.</u>, No. 2:19-CV-1596-DMC, 2021 WL 1212649, at *14 (E.D. Cal. Mar. 31, 2021) ("Although the ALJ included Plaintiff's historical subjective complaints, she does not adequately link Plaintiff's testimony to portions of the record supporting the adverse credibility decision"), *here*, the ALJ completed a significantly detailed analysis of

the relevant evidence, the testimony of Plaintiff and his mother and friend, and extensively discussed why certain medical opinions were more persuasive and in line with the evidence as a whole, and why more extreme medical opinion limitations were not persuasive.  The Court finds this extensive discussion and reasoning as a whole is sufficiently pointed and applicable to weighing the Plaintiff's testimony here.

As the Court found in the previous section, the ALJ properly weighed the medical opinions in the record.  The ALJ clearly discussed and explained why the limitations were not supported, and why the other medical opinions were more supported.  The Court finds this extensive discussion of the medical opinions, and other medical evidence of record, in this case, provides a clear and convincing reason supported by substantial evidence in the record for the ALJ to discount the symptom testimony.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.") (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.1995)); Hamm v. Saul, 804 F. App'x 810, 811–12 (9th Cir. 2020) ("Hamm's testimony was inconsistent with, and unsupported by, the medical evidence of record") (citing Carmickle, 533 F.3d at 1161; Burch, 400 F.3d at 681); Streeter v. Berryhill, No. 1:17-CV-01450-JDP, 2019 WL 1060041, at *5 (E.D. Cal. Mar. 6, 2019) ("the extensive medical evidence summarized above provides clear and convincing reasons supported by substantial evidence for the ALJ's credibility determination . . . [and] further considered and gave weight to the medical opinions") (citing Carmickle, 533 F.3d at 1161), aff'd sub nom. Streeter v. Saul, 835 F. App'x 305 (9th Cir. 2021); Jonathan D. v. Comm'r Soc. Sec. Admin., No. 3:20-CV-01270-MK, 2021 WL 4956854, at *3 (D. Or. July 26, 2021) ("An ALJ may discount a claimants statements if medical opinion evidence contradicts the claimant's subjective testimony") (citing Carmickle, 533 F.3d at 1161), report and recommendation adopted, No. 3:20-CV-01270-MK, 2021 WL 4955899 (D. Or. Oct. 22, 2021).  Here, unlike Facey, the Court is not "unable to meaningfully review [the ALJ's] apparent reasons without improperly substituting its conclusions for the ALJ's or speculating as to what the basis of her conclusions were."  C.f. Facey, 2021 WL

1   1212649, at *15.[7]

2      Additionally, the ALJ noted repeated instances of noncompliance with prescribed

3   medication regimes, and with referrals to psychological counseling.  The Court finds the ALJ's

4   reliance on noncompliance with treatment to be a clear and convincing reason to afford the more

5   extreme limitation testimony less weight in relation to weight of the objective medical evidence

6   and other medical opinions in the record.  See Tommasetti, 533 F.3d at 1039 (in assessing

7   credibility, the ALJ may consider an "unexplained or inadequately explained failure to seek

8   treatment or to follow a prescribed course of treatment.") (quoting Smolen, 80 F.3d at 1284).

9   Given review of the records pertaining to the repeated history of noncompliance, both with

10  medication and counseling referrals, the Court finds Plaintiff's arguments concerning a failure by

11  the ALJ to consider good cause to follow prescribed treatment to be unavailing.

12     Accordingly, the Court finds the ALJ provided clear and convincing reasons supported

13  by substantial evidence in the record for discounting Plaintiff's symptom testimony.  Stubbs-

14  Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) ("In addition, the medical evidence,

15  including Dr. Eather's report and Dr. Neville's report—which both found [claimant] could

16  perform a limited range of work—support the ALJ's credibility determination."); Kallenbach v.

17  Berryhill, 766 F. App'x 518, 521 (9th Cir. 2019) ("The ALJ provided specific, clear, and

18  convincing reasons for discounting Kallenbach's testimony, including inconsistencies between

19  Kallenbach's allegations of impairment and his medical treatment records, inconsistencies

20  between the medical opinion evidence and Kallenbach's testimony, and Kallenbach's failure to

21  seek and adhere to prescribed treatment."); Lake v. Colvin, 633 F. App'x 414, 415 (9th Cir.

22

23  [7] The Court also recognizes that a *lack* of objective medical evidence to support a claim cannot form the sole basis
    presented by the ALJ for rejecting pain testimony, however, even a lack of medical evidence can be a proper factor

24  for the ALJ to consider in weighing a claimant's testimony.  See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir.
    2001) ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of

25  itself, is not a clear and convincing reason for rejecting it."); Burch, 400 F.3d at 680-81 ("Although lack of medical
    evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his

26  credibility analysis . . . Contrary to Burch's argument, the ALJ did not solely rely on the minimal objective evidence
    and Burch's daily activities in discrediting her testimony.  Indeed, these factors were among those he relied on,

27  however, the ALJ made additional specific findings to support his credibility determination.").  While a *lack* of
    objective medical evidence may not be the sole basis for rejection of symptom testimony, inconsistency with the

28  medical evidence or medical opinions can be sufficient.  See Carmickle, 533 F.3d at 1161; Streeter, 2019 WL
    1060041, at *5.

2016) ("The ALJ provided specific, clear, and convincing reasons for the credibility assessment, including inconsistencies between Lake's testimony regarding his limitations and the medical opinions and documentary evidence.").

### C.   Whether the ALJ Erred in Finding Plaintiff Did Not Meet or Equal a Listing

Plaintiff submits that the ALJ's finding that the severity of Plaintiff's mental impairments did not meet or equal the requirements of any listing is not supported by substantial evidence.

#### 1.   General Legal Standards

At step three in the sequential process, the ALJ is to determine if the claimant has an impairment that meets or equals one of a list of specific impairments described in the regulations. 20 C.F.R. § 404.1520(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999); Burch, 400 F.3d at 679.  "The Secretary does not consider a claimant's impairment to be one listed in Appendix I solely because it has the diagnosis of a listed impairment."  Marcia v. Sullivan, 900 F.2d 172, 175 (9th Cir. 1990) (quoting 20 C.F.R. § 404.1525(d)).  The ALJ is required to review the symptoms and make specific findings essential to the conclusion.  Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990).  "An examiner's findings should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based, so that a reviewing court may know the basis for the decision."  Id.  However, the ALJ need not state why a claimant failed to satisfy every different section of the listings.  Id. at 1201.  The ALJ's evaluation of the evidence can be "an adequate statement of the 'foundations on which the ultimate factual conclusions are based.' "  Id.

"An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment.  A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  However, the ALJ need not discuss the findings in any specific section of his opinion.  Lewis, 236 F.3d at 513.[8]

---

[8]  In Marcia, the plaintiff argued that the ALJ's finding at step three was insufficient to show that the ALJ actually considered whether the medical evidence equaled a listed impairment.  900 F.2d at 176.  The ALJ's finding as to

1     To meet a listing, an impairment "must also have the findings shown in the Listing of that

2  impairment." Marcia, 900 F.2d at 175. "To meet a listed impairment, a claimant must establish

3  that he or she meets each characteristic of a listed impairment relevant to his or her claim. To

4  equal a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at

5  least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a

6  claimant's impairment is not listed, then to the listed impairment 'most like' the claimant's

7  impairment." Tackett, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526). The Ninth Circuit has

8  also held that "[a]n ALJ is not required to discuss the combined effects of a claimant's

9  impairments or compare them to any listing in an equivalency determination, unless the claimant

10  presents evidence in an effort to establish equivalence." Kennedy v. Colvin, 738 F.3d 1172,

11  1178 (9th Cir. 2013) (quoting Burch, 400 F.3d at 683). Equivalence may be determined if the

12  claimant has multiple impairments none of which meets the listing requirement, but which when

13  viewed in the aggregate are equivalent to a listed impairment. Burch, 400 F.3d at 682. In

14  determining if a claimant's combination of impairment equals a listing the ALJ must consider his

15  symptoms in combination and cannot fragment them in evaluating their effects. Lewis, 236 F.3d

16  at 513.

17     2.   The ALJ's Step Three Findings and Conclusions

18     The ALJ made the following findings and conclusions at step three of the sequential

19  analysis, finding Plaintiff did not meet or equal the relevant listings:

20         The severity of the claimant's mental impairments, considered
            singly and in combination, do not meet or medically equal the
21         criteria of listings 12.04, 12.06, 12.08, and 12.10. In making this
            finding, I have considered whether the "paragraph B" criteria are
22         satisfied. To satisfy the "paragraph B" criteria, the mental
            impairments must result in one extreme limitation or two marked
23         limitations in a broad area of functioning. An extreme limitation is
            the inability to function independently, appropriately, or
24         effectively, and on a sustained basis. A marked limitation is a
            seriously limited ability to function independently, appropriately,
25

26  medical equivalence was that "[t]he claimant has failed to provide evidence of medically determinable impairments
that meet or equal the Listings to Subpart P of Regulation 4 or the duration requirements of the Act . . . ." Marcia,
27  900 F.2d at 176. The Ninth Circuit found that this was insufficient and held that "the ALJ must explain adequately
his evaluation of alternative tests and the combined effects of the impairments." Id. Subsequently, in Lewis, 236
28  F.3d at 513, the Ninth Circuit held that an ALJ's discussion and evaluation of the evidence to support his conclusion
was sufficient even if not discussed under the relevant section of the ALJ's report.

or effectively, and on a sustained basis.

In understanding, remembering or applying information, the claimant has a moderate limitation. In interacting with others, the claimant has a moderate limitation. With regard to concentrating, persisting or maintaining pace, the claimant has a moderate limitation. As for adapting or managing oneself, the claimant has experienced a moderate limitation.

These findings are based on the well-supported opinion of the Disability Determination Service mental health consultants at the initial and reconsideration levels of review (Exhibits 1A, 3A), by the consultative psychiatrist Dr. Roger Izzi (Exhibits 7F, 12F), and by the assessments provided by Drs. McDonald, Middleton, and Reddy (Exhibits 1F, 2F, 3F, 4F, 6F, 8F). Nothing received at the hearing level warrants a significant deviation from this assessment and these psychiatric professionals gave adequate consideration to the claimant's subjective allegations, personal observations, treatment history, and the examination findings. My own assessment of the "paragraph B" criteria is based also on the effects of mood fluctuations as discussed further below.

Accordingly, I base my determination of the "B" criteria on the Disability Determination Service assessments and the supporting evidence is discussed further in the body of this decision.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria, because there is no evidence of mental health treatment or a documented history of a serious and persistent disorder over at least 2 years and evidence that the claimant has a minimal capacity to adapt to changes in his environment or demands not already part of daily life.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. The following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(AR 18-19.)

The Court finds that substantial evidence supports the ALJ's findings and conclusions at step three; that the ALJ evaluated the relevant evidence, before concluding the impairments did not meet or equal the listing; and when considering the extensive and detailed discussion of the

evidence after step three, the ALJ clearly did not issue a boilerplate decision.  Lewis, 236 F.3d at 512.   The ALJ's analysis clearly signifies his reliance on the opinions from the mental health consultants at the initial and reconsideration levels of review, the opinion of consultative psychiatrist Dr. Izzi who completed two consultative exams, and the assessments provided by Drs. McDonald, Middleton, and Reddy.   In the step three portion of the opinion, the ALJ expressly states "the supporting evidence is discussed further in the body of this decision."   As discussed above, the Court found the ALJ's reliance on the medical opinions and evidence as a whole to be proper and supported by substantial evidence.  Plaintiff has the burden at step three, and Plaintiff has not demonstrated the ALJ's analysis was flawed, aside from claiming the ALJ's analysis was boilerplate, and offering a different interpretation of the evidence that the ALJ thoroughly and reasonably discussed and applied in the RFC analysis portion of the opinion. While Plaintiff argues there is substantial evidence of record that Plaintiff suffers from severe limitations meeting and/or equaling the requirements of listing 12.08, based on the Court's review of the totality of the medical records and opinions, and the ALJ's thorough review, analysis, and discussion of such evidence, the Court only finds Plaintiff requests the Court to apply a different interpretation of the evidence.   Morgan, 169 F.3d at 603; Burch, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

Accordingly, the Court finds no error by the ALJ at step three in determining that Plaintiff did not meet or equal any relevant listing.

**V.**

**CONCLUSION AND ORDER**

Based on the foregoing, the Court finds that the ALJ did not commit error in assigning reduced weight to the opinions of Dr. Haack and Dr. Kamboj; in weighing Plaintiff's testimony; nor in finding Plaintiff's mental impairments did not meet or equal a listing at step three.   The Court finds the ALJ's decision to be free from remandable legal error and supported by substantial evidence in the record.   Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is DENIED.   It is FURTHER

1  ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security

2  and against Plaintiff Jonathan Jong-La Vue.  The Clerk of the Court is directed to CLOSE this

3  action.

4

5  IT IS SO ORDERED.

6  Dated:   **May 27, 2022**   _____

      UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28